JM:SH:DW
F.#2008R00802

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

KEN SUAREZ and
GILBERT BEITAL,

         Defendants.

- - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. _____
(T. 18, U.S.C., §§ 1349
 and 3551 et seq.)

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

### The Stock-Loan Business

1.     In the securities industry, financial institutions and their customers frequently engaged in transactions that required them to borrow securities from other financial institutions. In a typical stock-loan transaction, the lending institution and the borrowing institution established several financial terms for the stock-loan transaction. These terms typically included: (a) the form of collateral to be posted by the borrower, which was often cash; (b) the amount of the collateral, which was typically based on the market value of the securities being borrowed; and (c) the fees and other payments

that the parties would make to each other in connection with the transaction.

2.    When the stock-loan transaction was consummated, the borrower paid the cash or other collateral to the lender and, in exchange, the lender delivered the securities to the borrower. The lender could then earn interest on the cash collateral by using the cash to make low-risk short-term loans to other financial institutions. When a stock-loan transaction involved securities that were widely available, the lender would typically keep a portion of the short-term interest as a lending fee and pay the remaining interest, often referred to as a "rebate," back to the borrower. When a stock-loan transaction involved securities for which the supply was limited, often referred to as "hard to borrow" securities, the lender generally kept all short-term interest earned on the collateral provided by the borrower, and, in addition, the borrower generally paid a fee, known as a "negative rebate," back to the lender.

Stock-Loan Finders

3.    Stock-loan finders were entities that were in the business of facilitating stock loan transactions in exchange for fees.  Most finders were not registered broker-dealers. Borrowers and lenders typically paid the finder's fees from the fees, rebates and negatives rebates that they earned in connection with the particular stock-loan transaction.

Relevant Entities

4.    Schonfeld Securities, LLC ("Schonfeld") was a broker-dealer of securities registered with the United States Securities and Exchange Commission ("SEC").  Schonfeld was also a member of the National Association of Securities Dealers, Inc. ("NASD").

5.    First Southwest Company ("First Southwest") was an NASD member firm and a broker-dealer of securities registered with the SEC.

The Defendants

6.    In or about and between 2003 and December 2004, the defendant KEN SUAREZ was employed by Schonfeld as a securities-lending representative.  In or about and between January 2004 and December 2004, SUAREZ was the manager of Schonfeld's securities lending department.  SUAREZ's responsibilities included, among other things, borrowing and loaning securities on behalf of Schonfeld.  As an employee of Schonfeld, SUAREZ owed Schonfeld a duty of honest services and was required to make business decisions in the best interests of Schonfeld, without regard for his own or his family members' personal gain.

7.    In or about and between January 2004 and December 2004, the defendant GILBERT BEITAL controlled a corporate entity

4

named GilCar Securities ("GilCar").   Through GilCar, BEITAL

purported to act as a finder in the securities-lending industry.

The Fraudulent Scheme

8.   In or about and between January 2004 and December

2004, the defendant KEN SUAREZ, without the knowledge or approval

of Schonfeld, agreed with the defendant GILBERT BEITAL and a

corrupt stock-loan trader at First Southwest (the "Corrupt

Trader") that SUAREZ would cause Schonfeld to: (a) enter into

stock-loan transactions involving numerous securities (the

"Subject Securities") with First Southwest, indirectly, by using

an intermediary broker-dealer that acted as a middleman between

Schonfeld and First Southwest; and (b) pay to and receive from

First Southwest rebates and negative rebates in connection with

these transactions that were, on many occasions, less favorable

to Schonfeld than the rebates and negative rebates otherwise

available in the marketplace.   In exchange, the Corrupt Trader

would cause First Southwest to pay sham finder's fees on these

transactions to GilCar.

9.   Once the defendant GILBERT BEITAL and GilCar

received these sham finder's fees, BEITAL would cause GilCar to

pay kickbacks to the defendant KEN SUAREZ and the Corrupt Trader.

Specifically, BEITAL would cause GilCar to pay credit card,

mortgage and other bills for the benefit of SUAREZ, and to write

checks to the Corrupt Trader and the Corrupt Trader's juvenile daughter.

### CONSPIRACY TO COMMIT SECURITIES FRAUD AND WIRE FRAUD

10.   The allegations contained in paragraphs 1 through 9 are realleged and incorporated as though fully set forth in this paragraph.

11.   In or about and between January 2003 and December 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants KEN SUAREZ and GILBERT BEITAL, together with the Corrupt Trader and others, did knowingly and intentionally conspire:

a.   to execute a scheme and artifice to defraud Schonfeld, First Southwest and others, and to obtain money and property from Schonfeld, First Southwest and others by means of materially false and fraudulent pretenses, representations and promises, and to deprive Schonfeld and First Southwest of the intangible right of honest services of their employees, the defendant KEN SUAREZ and the Corrupt Trader, respectively, in connection with securities of issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, specifically, the Subject Securities, contrary to Title 18, United States Code, Sections 1348(1) and 1346; and

b.   to devise a scheme and artifice to defraud Schonfeld, First Southwest and others, and to obtain money and

6

property from Schonfeld, First Southwest and others by means of materially false and fraudulent pretenses, representations and promises, and to deprive Schonfeld and First Southwest of the intangible right of honest services of their employees, the defendant KEN SUAREZ and the Corrupt Trader, respectively, and for the purpose of executing such scheme and artifice, and attempting to do so, to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Sections 1343 and 1346.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

A TRUE BILL

_____
FOREPERSON

_____
BENTON J. CAMPBELL
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

## INFORMATION SHEET

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CR  0   337**

1.    Title of Case:  **United States v. Ken Suarez et al.**

2.    Related Magistrate Docket Number(s):

      None ( X )

**FFSON, J.**

3.    Arrest Date:

4.    Nature of offense(s):  ☒    Felony
                             ☐    Misdemeanor

5.    Related Cases - Title and Docket No(s).  (Pursuant to Rule 50.3 of the
      Local E.D.N.Y. Division of Business Rules): _____
      United States v. Patrick Verdi, 07 CR 709 (JG) _____

      _____

      _____

6.    Projected Length of Trial:    Less than 6 weeks    ( X )
                                     More than 6 weeks    (   )

7.    County in which crime was allegedly committed: ____Brooklyn_____
      (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.    Has this indictment/information been ordered sealed?    ( X ) Yes  (   ) No

9.    Have arrest warrants been ordered?                      ( X ) Yes  (   ) No

10.   Is a capital count included in the indictment?          (   ) Yes  ( X ) No

                                           BENTON J. CAMPBELL
                                           UNITED STATES ATTORNEY

                                  By:      _____
                                           Daniel E. Wenner
                                           Assistant U.S. Attorney
                                           718-254-6254

Rev. 10/01/03