UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

UNITED STATES OF AMERICA,        :

           :

               Plaintiff,        :      Docket No. 08 Cr. 337 (JG)

           :

           :

         - against -            :

           :

           :

KENNETH SUAREZ            :

           :

               Defendant.        :

-------------------------------------------------------------- x

## SENTENCING MEMORANDUM OF KENNETH SUAREZ

**COHEN & GRESSER LLP**

Mark S. Cohen (MC 9055)
Elizabeth F. Bernhardt (EB 4637)
100 Park Avenue, 23rd Floor
New York, NY 10017
Phone:  (212) 957-7600
Fax:  (212) 957-4514

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS..................................................................................................4

The Offense Conduct........................................................................................................4

Suarez's Arrest, Guilty Plea, Cooperation Agreement, and Forfeiture ...........................5

The Presentence Report ("PSR")......................................................................................6

ARGUMENT......................................................................................................................6

I.      Suarez's Cooperation, History, and Personal Characteristics Warrant a
        Non-Incarceratory Sentence. ..................................................................................6

        A.      Suarez's cooperation.......................................................................................7

        B.      *United States v. Booker* and Section 3553(a) ..............................................8

                1.      The Guidelines Recommendation ...................................................8

                2.      Factors justifying a non-incarceratory sentence .............................9

                        (a)    Suarez's life and career: the aberrational nature of his offenses...........9

                        (b)    Suarez's character.................................................................11

                        (c)    The need to punish and deter.................................................16

                        (d)    The need to avoid unwarranted disparities in sentencing....................16

II.     Recommendation as to Fine ..............................................................................17

III.    Recommendation as to Restitution ....................................................................18

        Conclusion ........................................................................................................21

## PRELIMINARY STATEMENT

This sentencing memorandum is submitted on behalf of defendant Kenneth Suarez.   On October 3, 2008, Mr. Suarez pleaded guilty to a Superseding Information charging him with two counts of Conspiracy to Commit Securities Fraud (18 U.S.C. ¶¶ 1349).  This Court is scheduled to sentence Mr. Suarez on July 2, 2010.

We respectfully request that, in the exercise of its discretion, the Court downwardly depart from the applicable Guidelines range and impose a non-incarceratory sentence, for two reasons:

First, the government has moved for a downward departure pursuant to Section 5K1.1 of the Sentencing Guidelines, based on the substantial assistance that Mr. Suarez rendered to the government in the investigation and prosecution of other persons.  As set forth more fully in the government's motion for a downward departure pursuant to Section 5K1.1, Mr. Suarez provided substantial assistance in the successful prosecution of Kevin King, as well as providing useful background information regarding the securities lending industry.  We respectfully urge the Court to grant the government's motion for a downward departure.

As part of his cooperation, Mr. Suarez not only admitted his guilt as to the then charged Beital scheme, he also provided additional information about himself and an additional kickback scheme (the King scheme) that he had participated in.  As we understand it, the government was not aware of the King scheme prior to Mr. Suarez's cooperation.  Suarez's admissions resulted in his being charged with an additional criminal count; pleading guilty to the additional count; and becoming subject to a significantly higher Guidelines offense level, as well as larger financial penalties.  Also

as part of his cooperation agreement, Suarez forfeited all of his illicit gains, $125,000, which he has paid in full.

Second, Mr. Suarez's character and work history, including the history of his offenses, justify a non-incarceratory sentence. Mr. Suarez is a good and decent man. He is 60 years old and has worked for over 40 years. Except for one aberrational year, 2004, he has had a productive and honorable work history.

Mr. Suarez joined the work force while in high school, working after school in the securities industry as a "temp." Thereafter, except for two years working in a relative's dry-cleaning business, he worked at a series of low- and mid-level jobs in a variety of securities firms.

Late in his career, Suarez was terminated from his job because he made a significant  error in a calculation. For more than a year, in 2002 and 2003, he was unemployed. When at last he found another job, in September 2003, it was at Schonfeld Securities ("Schonfeld"), where a kickback scheme was in full swing. The man who hired Suarez,  Patrick Verdi ("Verdi"), ran the kickback scheme; it soon became known to Suarez that Verdi owned a sham "finder" company to receive kickbacks.

In the winter of 2004, a month or two after Verdi retired, Suarez began to participate in distinct but related schemes, drawn in by two friends who offered him kickbacks in exchange for his continuing the schemes and referring Schonfeld's business to them.

In the scheme with Gilbert Beital ("Beital"), Suarez participated for about a year. In the scheme with Kevin King ("King"), Suarez participated for three months and then attempted to extricate himself in April 2004:  thereafter, he continued referring business to King, but he stopped accepting the kickbacks, and told King to pay more to Schonfeld

instead (which is what occurred). In December 2004, Suarez stopped participating in both schemes.

After ending the schemes, Suarez continued working, honestly, at Schonfeld until 2007. He was arrested on May 22, 2008, almost four years after his cessation of illegal behavior.

Except for his aberrational conduct in 2004, Mr. Suarez has a 40-year long record of work and service. This service continues to the present. After his arrest in the instant case, Suarez was unemployed for a year. With arthritis and back pain (see records annexed hereto as Exhibit B) (and a devoted wife who, at 67, nonetheless works full-time), Suarez could have given up searching for work. Instead, in April 2009, Suarez began working full-time as a driver for MV Transportation, Inc. His job is to assist and drive elderly, mentally challenged, and physically disabled adults to medical and other appointments. He earns $12.50 an hour. In addition, in 2008, Suarez was selected to be a Eucharistic minister, administering communion in church on Sundays and to people who are housebound.

Suarez has accepted responsibility for his conduct and is deeply remorseful for what he did and the harm that he caused. The eleven letters in Exhibit A attest to the kind of person Suarez is, conveying a vivid impression of his humility, personal warmth, and kindness to his family, friends, and neighbors. The letters give a sharp sense of his shame and remorse and the ways in which he has gone about rebuilding his life.

We respectfully assert that, given all of these factors – Mr. Suarez's substantial assistance to the government and its motion under Section 5K1.1; Mr. Suarez's age, health, and work history; his good character; the aberrational nature of his offenses; and his remorse – a non-incarceratory sentence would be fair and appropriate. Moreover, a

non-incarceratory sentence would be consistent with other sentences this Court has imposed in related cases (e.g., on Patrick Verdi and Ronald Garcia).

In addition, we request that the Court not impose joint and several liability for restitution. As noted, Suarez has already forfeited and repaid all of his illicit gains ($125,000 - $90,000 from the Beital scheme and $35,000 from the King scheme). We respectfully submit that it would be harsh to impose liability for the full $301,000 loss that the government has calculated on the King scheme, given that Suarez illicitly profited to a much lesser degree ($35,000). This Court apportioned restitution separately, in the amount of the defendants' individual gains, in sentencing Beital and Verdi. Though co-conspirators, Beital and Verdi were ordered to pay restitution only in the amounts that they individually profited. Given Suarez's age and circumstances, we respectfully ask the Court to follow this practice in sentencing him as well.

## STATEMENT OF FACTS

### The Offense Conduct

The offense conduct occurred during a brief period in Mr. Suarez's 40-year work history. In 2004, when he was 54 years old, Suarez began taking kickbacks for referring his employer's stock-lending business to two particular individuals, Gilbert Beital of Gilcar Securities ("Gilcar"), and Kevin King of Van Der Moolen Specialists, USA, LLC ("VDM"). Mr. Suarez's employer during the period of his receiving kickbacks was Schonfeld Securities LLC ("Schonfeld"). The kickbacks amounted to a total of about $125,000 ($90,000 from the Beital scheme, and $35,000 from the King scheme).

The background to Suarez's 2004 conduct is that he was terminated from a job in 2002 and could not find work for over a year. When at last he found work, in September 2003, it was at Schonfeld, where a kickback scheme was already well established and run

4

by his boss, Patrick Verdi ("Verdi"). When Verdi retired in December 2003, leaving Suarez in charge of stock lending, Suarez continued Verdi's practice of referring significant portions of Schonfeld's stock loan business to Gilcar and VDM.

Initially, when offered kickbacks, Suarez declined to accept them. But in or about January or February 2004, he began to take kickbacks in exchange for his referrals.

Soon afterward, Suarez unilaterally stopped taking kickbacks from King. After three months, in or about April 2004, he told King that he would no longer take money, and that King should pay Schonfeld a higher rebate instead. Suarez felt that this ended his participation in the scheme with King (though he continued to direct a portion of Schonfeld's business to King, as well as Beital, until December 2004).

**Suarez's Arrest, Guilty Plea, Cooperation Agreement, and Forfeiture**

Suarez was arrested on May 22, 2008, based on his 2004 dealings with Beital. *See* Indictment, United States v. Suarez, 08 Cr. 337 (JG), filed May 22, 2008, at page 5.

Thereafter, Suarez entered into a cooperation agreement with the government. Suarez provided the government with information about the additional kickback scheme he had been involved with, involving King and VDM. As we understand it, the government had previously been unaware of this second scheme. *See* Superseding Information, United States v. Suarez, 08-337 (JG) (S-1), filed October 3, 2008 (Count Two, "The VDM Specialists Scheme," at page 7); and *see* Cooperation Agreement dated October 3, 2008, page 2 (Court Exhibit 1).

On October 3, 2008, Mr. Suarez pled guilty in both the Gilcar and VDM Specialists schemes, as charged in the Superseding Information.

Mr. Suarez agreed to forfeit his gain from the two schemes ($125,000); to provide the government with truthful, complete and accurate information; and to testify fully and truthfully in any proceedings brought by the government. *See* Cooperation Agreement ¶3.

Mr. Suarez complied fully with the Cooperation Agreement. He met on two occasions – Sept. 5, 2008 and June 25, 2009 – with Assistant United States Attorneys and other law enforcement agents in the Eastern District of New York. He provided truthful, complete and accurate information to the best of his ability. As a result, we are informed, the government was able to bring a prosecution against King and was assisted in its prosecution of other persons. Suarez also made his forfeiture payments in full.

**The Presentence Report ("PSR")**

The PSR contains certain inaccuracies, and Suarez has objected to them. (See Suarez's Objections to the PSR.)

Two areas of inaccuracy could potentially affect sentencing. First, the PSR does not acknowledge Suarez's role in refusing kickbacks and ending the schemes (see Objections p. 2). Second, the PSR in effect doubles the amount of Suarez's assets by failing to note that his home, savings account, and family cars are jointly owned with Rozanne Collura Suarez, his wife of over 30 years (see Objections pp. 4-5).

## ARGUMENT

**I.     Suarez's Cooperation, History, and Personal Characteristics Warrant a Non-Incarceratory Sentence.**

A non-Guidelines, non-incarceratory sentence is warranted here for several reasons, including Suarez's cooperation and his history and character.

A.    **Suarez's cooperation**

We respectfully request that the Court grant the government's motion to

downwardly depart from the Guidelines because of Suarez's substantial assistance.   As

set forth in the government's letter dated June 11, 2010,

> [Suarez] provided detailed information about his meetings and
> conversations with Beital and King to orchestrate the schemes, the manner
> in which the trades were executed, and the locations where he received the
> cash kickbacks from King.  In addition, Suarez also provided background
> information about a number of other individuals targeted by the
> government in its industry-wide investigation into the stock-loan industry.
> Suarez's information assisted the government in understanding the
> workings of Schonfeld's stock-loan desk and the relationships between
> stock-loan traders and stock-loan finders.
>
> Suarez was prepared to testify against King had King gone to trial. . . .
> Suarez's testimony at trial was a big factor in King's ultimate decision to
> plead guilty.

As part of his cooperation, Suarez pled guilty to an additional crime that, as we

understand it, the government previously had been unaware of.  As a direct consequence,

Suarez's Guidelines level and the magnitude of fine and restitution to which he is

exposed were significantly increased.  The loss calculated on the Beital scheme, which

was the basis of Suarez's arrest, was about $90,000.  Pursuant to U.S.S.G.

§ 2B1.1(b)(1)(E), this added 8 points to Suarez's Guidelines offense level, bringing it to

level 16, with a recommended sentence range of  21-27 months.  By contrast, the loss

calculated on the King scheme is over $301,000.  Because Suarez confessed and pled

guilty to the King scheme as well as the Beital scheme, Suarez's current Guidelines level

is 20, with a recommended sentence range of 33-41 months.  U.S.S.G. § 2B1.1(b)(1)(G).

In addition, although Suarez's illicit gain from the King scheme was $35,000, his guilty

7

plea on the King scheme increased his total potential restitution to $391,000 (from $90,000), and his liability for a fine to $782,000 (from $180,000).

Accordingly, we respectfully submit that it would be fair and appropriate to downwardly depart from the Guidelines pursuant to U.S.S.G. § 5K1.1.

### B.    *United States v. Booker* and 18 U.S.C. § 3553(a)

Under *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), district courts in this circuit must first consider the Guidelines and determine what the Guidelines range is; then consider the factors set forth in 18 U.S.C. § 3553(a); and then decide, *inter alia,* whether to impose a Guidelines or non-Guidelines sentence. *Crosby,* 397 F.3d at 111-114.

### 1.    The Guidelines Recommendation

Under the Guidelines, a sentence ranging from 33 to 41 months (level 20) would be recommended. This range would be achieved as follows: The base offense level is 7. There were two offenses, but one victim, Suarez's employer, and the common objective was to receive kickbacks in exchange for referring the employer's business. *See* 18 U.S.C. §§ 1343, 1348, 1349; U.S.S.G. §§ 3D1.1(a); 3D1.2(d); 3D1.5.

Suarez does not have any means of ascertaining his employer's loss: his own profit at Schonfeld's expense was approximately $125,000. The government has calculated the total loss as over $90,000 on the Beital scheme and over $300,000 on the King scheme, which inferentially includes illicit gains by other defendants. The PSR states that the total illicit gain was $396,121; the government calculates the total loss as $391,187.92. Regardless of which figure is used, a 12-point enhancement is called for. *See* U.S.S.G. § 2B1.1(b)(1)(G). Because Suarez worked for a broker-dealer, under the Guidelines there is a further enhancement of 4 points. See U.S.S.G. § 2B1.1(b)(15).

8

Finally, 3 points should be deducted because Mr. Suarez accepted responsibility and the government has stated that it will move for a reduction because of his timely notice of his intention to plead guilty. See U.S.S.G. § 3E1.1.

### 2. Factors justifying a non-incarceratory sentence

We respectfully submit that a non-incarceratory sentence would be appropriate because of Suarez's substantial cooperation and the government's motion for a downward departure pursuant to Section 5K.1. As well, a non-incarceratory sentence is appropriate in light of relevant Section 3553(a) factors, including (1) the nature and circumstances of Suarez's offenses, (2) his otherwise honest life and good character, (3) his acceptance of responsibility and remorse, and (4) to avoid disparity with the sentences imposed on other defendants. *See* 18 U.S.C. 3553(a). No incarceration is required by the statutes to which Suarez pled guilty; *see* 18 U.S.C. §§ 1343, 1348, 1349.

### (a) Suarez's life and career: the aberrational nature of his offenses

Suarez was born and raised on Staten Island, and educated in parochial schools there. His father, who died in 1998, was a manual worker for the State of New Jersey; his mother, who died last year, kept the books for a local clothing store.

Suarez has been married to Rozanne Collura Suarez for over 30 years. They live on the same block that Suarez grew up on, near where Suarez's parents lived (and where his younger sister and only sibling, Lynn Suarez, still lives). It is a close family.

While a student at St. Peter's High School, Suarez began working as an after-school and summer "temp" in brokerage houses, as well as working in a relative's dry-cleaning business. He attempted college but was unable to focus. Thereafter, Suarez

worked at a series of brokerage firms in low- to mid-level positions. For the most part, he worked in the securities-lending departments of those firms.[1]

Suarez worked productively. However, in 2002 he made an error in calculating a dividend at Fortis Investor Services and was terminated for his mistake. Thereafter, Suarez was unemployed for a year. When at last Suarez found work, in September 2003, it was in the stock loan department at Schonfeld, where Patrick Verdi's kickback scheme was an open secret. After Verdi retired, in December 2003, two of Suarez's friends in the industry, Beital and King, urged him to perpetuate their relationship with Schonfeld by continuing to refer business to them in exchange for kickbacks. Though at first he demurred, in January Suarez agreed to take kickbacks from Beital and King.

Suarez took kickbacks from Beital for about a year. He stopped taking kickbacks from King after only three months. In April 2004, Suarez told King he would no longer accept kickbacks from him, and that King should pay the money to Schonfeld instead (which King did).

Suarez's participation in the schemes was out of character for him. As Suarez's wife writes, Suarez "cannot comprehend what he was thinking" during that time (R. Suarez Letter, Exhibit A). His actions were deeply inconsistent with his religious beliefs and his previous decades of solid work.

In December 2004, the conflict was resolved when Schonfeld revised its stock-loan practices and the schemes ended. Suarez continued working at Schoenfeld and he began attending church and taking communion on a daily basis (Rev. Titus Letter, Exhibit A).

---

[1] The thirteen firms that Suarez worked for, from 1972 to 2008, were: Loeb Rhoades; AG Becker; Countrywide; Brothers; Moore Schly; FL Rothschild Unterberg & Towbin; Spear Leeds & Kellogg; Kemper Clearing Corp.; Maybon Securities; Daiwa Securities; Fortis Investor Services; Schonfeld Securities; and Wed Bush Morgan Securities.

Consistently, after his arrest in 2008, Suarez confessed not only to what the government knew about – the kickback scheme with Beital – but also to what the government did not know about – the kickback scheme with King.  He pled guilty to both schemes.  In addition, he forfeited to the government all of his illicit profits ($125,000).  There is no dispute that he was and is remorseful.

Subsequently, Suarez found a new job, driving elderly and disabled adults to medical and other appointments.  Also, in 2008, he became a Eucharistic minister, distributing communion and bringing it to the homebound.  His pastor praises him for ministering to others (Rev. Titus Letter, Exhibit A).

### (b)   Suarez's character

Eleven letters come to this Court – from Suarez's wife, sister, brother-in-law, priest, and friends.  The letters paint the portrait of a warm-hearted, humble man who puts others before himself.  In addition, the letters describe a man who is religious and remorseful.

The writers make the point that Suarez is humble and giving, with specific examples.  For instance, on a family vacation to Europe, Suarez did not forget his elderly uncle, who was unmarried, childless, and blind.  Rather, Suarez roomed with his uncle on the trip, packed for him, and took care of him throughout so that his uncle would not be left behind.  This was not unusual behavior for Suarez – it was typical of him.  Elderly relatives accompanied Suarez and his wife on "many" vacations (Lynn Suarez Letter; see also letters from Philip Collura, Rosanne Giammarino, Jill Sullivan, Kathryn Casoria, and Sandra Jerro).

Suarez also took devoted care of his mother, who died a year ago.  Lynn Suarez writes of how, in their mother's final illness, she and Suarez managed to keep their

11

mother at home, in out-patient hospice care. "This was a very hard time both physically and emotionally and I could not have done it without my brother. He always remained calm, compassionate and kind to her no matter what the request; day and night" (L. Suarez Letter). Philip Collura, Suarez's brother-in-law, adds, "Ken cared for his mother at home until her death. He was there years earlier for my sister and I at the end of our parents' lives" (P. Collura Letter). Rozanne Collura Suarez, Suarez's wife, confirms that Suarez "was always there for everyone in every way possible. Running errands, taking them where they needed to go, and including them in our lives" (R. Suarez Letter).

Suarez behaves unselfishly to his friends and neighbors, as well as his relatives. All of the letter writers describe him as "kind and caring," the person that is "always there" for them. One long-time friend describes Suarez as "the type of individual who is always willing to help. . . . who can always be counted on for support. He will always go out of his way and lend a hand to help another individual" (Casoria Letter; see also letter from P. Collura).

For example, "He is someone who doesn't hesitate to jump up and wash the dishes when we visit friends. This might seem trivial, washing dishes – but what guy do you know who would do that?" (P. Collura Letter). Jill Sullivan, a friend for 35 years, writes, "When we shared a meal, Kenny was always the first to help with cooking, serving, cleaning up and whatever else needed to be done" (Sullivan Letter). "He is the first one to offer to help" (R. Suarez Letter).

Suarez's friend Irene Tum-Suden summarizes, "He always puts others before himself" (Tum-Suden Letter).

Suarez and his wife do not have children, but Suarez routinely extends himself to the children of his friends and relatives (L. Suarez Letter). He is "very kind to and enjoys

being with" them (L. Suarez).  As an example, Rosanne Giammarino records that Suarez
often spent time with a young cousin whose parents were divorced.  With an absent
father, the cousin was "in need of affective support, guidance, and mentoring," which
Suarez stepped in to supply (Giammarino Letter).  Suarez also extended himself toward
the children of Irene Tum-Suden.  Ms. Tum-Suden writes:

> My life and the life of my family has been greatly enriched by Kenny's
> caring and friendship.  As a single mother . . . I could never give enough
> praise and thanks to Kenny for his ever caring presence and the generosity
> of self that he always bestowed on us.  He has been a role model and
> mentor to my family. . . . . Kenny . . . helped my son to become a
> wonderful man and a contributing member of society.

(Tum-Suden Letter).

Suarez also extends himself financially to help others.  The Rev. Austin Titus III ,
the pastor of Suarez's church, notes that Suarez "is a frequent contributor to our parish
food pantry, where we collect food for the poor."  Suarez also contributes to St. Jude's
Children's Hospital, Clothing for the Needy, Toys for Tots, Cardinal's Appeal, and many
other charities.  Suarez's brother-in-law recalls that when he needed a loan to buy a
house, Suarez came through, though "it wasn't easy" for him (P. Collura Letter).

In sum, all of these writers, most of whom have known Suarez for decades,
describe him as compassionate, unselfish, and giving, "the person I would not hesitate to
call upon in time of need and I know that he would be there with no questions asked"
(Sullivan Letter).

The writers are confused by the contradiction between what they know about
Suarez – his integrity and unselfishness – and the offenses he committed.   Kathryn
Casoria comments, "The situation is totally out-of-character of the person I know"
(Casoria Letter).  Ms. Sullivan writes that Suarez's crimes were "truly out of character for

him" (Sullivan Letter). Every writer comments on how uncharacteristic Suarez's crimes are, describing him as a person of honesty, integrity, and goodness.

As an example, Lynn Suarez describes her brother's insistence on returning money when too much change was given (L. Suarez Letter; see also letters from John Williams, Sullivan, Tum-Suden, and R. Suarez). Ms. Giammarino recalls Suarez's youth, working after school in a dry cleaning store. Finding concert tickets in a jacket, Suarez returned them to Giammarino's sister (Giammarino Letter). Rozanne Suarez recalls that her husband "always worked hard, getting up at 5:00 to be sure he was in early so that everything was prepared for the day ahead, not only for him but his co-workers. I've met so many of his superiors and colleagues over the years and they always told me what an intelligent, innovative, reliable, diligent person he was" (R. Suarez Letter).

Rozanne Collura Suarez's letter is in a class by itself because she knows him best. She writes of Suarez, "He is an inherently good person and gets genuinely upset when someone is discourteous or shows indifference to another human being." "[H]e is truly a wonderful person who . . . made a terrible, terrible mistake." (R. Suarez Letter)

All of the letter-writers remark on Suarez's "agonizing" remorse. Ms. Giammarino notes that Suarez's guilt is "devastating . . . and will always be a source of remorse and distress. This circumstance is contrary to Kenny's very purpose" (Giammarino Letter; see also letters from Casoria and Williams).

Suarez's pastor, who has known him since 2003, wrote in 2009 that Suarez "has been doing daily penance to atone for his actions for 4 years" – i.e., since 2005. Rev. Titus notes that Suarez is "a regular" – at daily mass, at daily communion, and at Sunday mass (Titus Letter). Suarez prays daily for forgiveness (Sullivan Letter; see also R.

Suarez Letter).  He also meditates (Casoria Letter).  He prays not only for himself, but to help take this burden off his family" (R. Suarez).  "His . . . thoughts and actions now are for those people" he has hurt (Tum-Suden Letter).

The suffering of his family and friends "is a punishment that Kenny now bears every day of this life" (Tum-Suden).  He bears a "heavy burden" (P. Collura).  John Williams writes, "I know he is . . . regretful and remorseful" (Williams).  Suarez's sister elaborates that he

> would change what he had done in a heartbeat if that were possible . . .
> Disappointing his mother, wife and family is something he has to live with
> and I know it is not easy for him.  He was always a religious man
> attending Mass faithfully and now is even more devote[d], attending Mass
> daily since he is no longer employed.[2]  H[e] has become an Eucharistic
> Minister and needs to find some peace knowing that God has forgiven
> him.

(L. Suarez Letter; see also letters from Jerro and P. Collura).

Ms. Tum-Suden adds that Suarez "now, in his true character, is ministering to others.  I know that Kenny is a man who will do everything humanly possible to right the previous wrongs and to ease the suffering of those around him" (Tum-Suden Letter).

Suarez's devoted wife states:

> He is a devout Catholic and is extremely distressed and distraught over this
> situation.  He cannot comprehend what he was thinking.  His prayers are for
> guidance for himself and to help me and our families get through this.  He is
> inconsolable when it comes to thinking of how he hurt and devastated his family,
> friends, and former co-workers.  His early mornings are spent at mass and then
> [he] goes to a chapel to pray. . . . I just want him to find some peace in his heart.

(R. Suarez Letter).

Lynn Suarez adds, "I know my brother made a huge mistake and I cannot make any sense of why he did it, but I can attest to the fact that he is truly sorry for doing it" (L. Suarez).

---

[2] Ms. Suarez's letter was written in March 2009, just before Suarez found his current job.

Without doubt, Suarez has accepted responsibility for his criminal conduct, not only legally, but morally.

### (c)  The need to punish and deter

Section 3553(a)(2) addresses the need for a sentence to promote respect for the law, to deter, and to punish. We respectfully submit that there is no need to incarcerate Suarez for these purposes.

As discussed above, Suarez has fully accepted responsibility both legally and morally. He confessed to an additional crime that the government was unaware of, forfeited his gains, and settled a civil lawsuit filed by the SEC that followed on his indictment. In addition, he has found meaningful work in which he serves others. The facts show someone who has already been specifically deterred, for whom incarceration would not serve a purpose.

Moreover, incarceration would have an unusually harsh effect on Suarez, given his age, arthritis, and back condition. As the medical reports in Exhibit B corroborate, Suarez has bulging and herniated discs and spinal stenosis. Incarceration would be more difficult for him than for the "typical" defendant. *See United States v. DeRiggi*, 893 F. Supp. 171, 182-83 (E.D.N.Y. 1995) (citing Second Circuit approvals of departures "in a variety of situations in which incarceration would have an unusually harsh impact on the defendant"), *aff'd,* 72 F.3d 7 (2d Cir. 1995).[3]

### (d)  The need to avoid unwarranted disparities in sentencing.

Section 3553(a)(6) requires courts to consider, inter alia, the sentences imposed on defendants "with similar records who have been found guilty of similar conduct."

---

[3] We are not moving for a formal departure based on Suarez's health.

Here, four other defendants pleaded guilty to similar or related conduct:  Patrick Verdi, Gilbert Beital, Ronald Garcia, and Kevin King.  King has not yet been sentenced; he is scheduled to be sentenced on June 25, 2010.  Of the three others, two were sentenced to probation with community service.  On October 2, 2009, this Court sentenced Verdi to three years of probation with 250 hours of community service.  On May 5, 2010, the Court sentenced Garcia to probation of three years with 150 hours of community service.

Only Beital was confined.  On October 31, 2008, the Court sentenced Beital to five years of probation, with intermittent confinement of eight weekends and six months of home detention, as well as 250 hours of community service.  However, unlike Suarez, Beital did not cooperate with the government.  Moreover, Beital participated in the kickback schemes over a much longer time – four years (starting with Verdi).

Though every individual is unique, we respectfully suggest that Suarez – whose role and whose gains were minimal in comparison to Verdi's and Garcia's – should be treated similarly, and be sentenced to probation, rather than face incarceration.  *See United States v. Arreaga*, No. S303 CR.1121-02 (RWS), 2006 WL 278156 at * 7 (S.D.N.Y. Feb. 2, 2006) (taking into account the sentences of the co-defendants), *citing Ferrara v. United States*,  372 F. Supp. 2d 108 (D. Mass. 2005), *aff'd* 456 F.3d 278 (1st Cir. 2006).

## II.    Recommendation as to Fine

We respectfully request that no fine be imposed.  No fine was imposed on Beital, Verdi and Garcia.

Suarez is 60 years old and earns $12.50 an hour.  His wife is the primary breadwinner and is 67 years old.  Suarez has limited resources:  one-half the marital

17

home, his car, and one-half of a marital savings account (about $45,000); he also owns a one-fourth share in his sister's home. *See* Defendant's Objections to the Presentence Investigation Report ("Objections"), pp. 4-6.

Given his minimal assets and income, a fine would be unduly burdensome on both him and his wife. *See* 18 U.S.C. § 3572(a) (the court "shall consider . . . the defendant's income, earning capacity, and financial resources" and "the burden that the fine will impose" on any person "that would be responsible for" the defendant's welfare).

## III.    Recommendation as to Restitution

It is within the Court's discretion whether to impose joint and several liability or to apportion restitution according to "the level of contribution to the victim's loss" and each defendants' "economic circumstances." 18 U.S.C.§ 3664(h). *And see United States v. Nucci*, 364 F.3d 419, 422 (2d Cir. 2004).

Here, for four reasons, we respectfully request that Suarez's restitution be limited to the amount of his unlawful gain ($125,000), which he has already forfeited and paid This is well within this Court's discretion. *See United States v. Abbadessa*, 848 F.Supp. 369, 382 (E.D.N.Y. 1994) ("Each defendant will be required to pay restitution in the amount that he received in illegal payoffs"), *vacated on other grounds by United States v. DeRiggi*, 45 F.3d 713 (2d Cir. 1995); *United States v. Concepcion*, 795 F. Supp. 1262, 1299 (E.D.N.Y. 1992) (finding it "more efficient" to apportion restitution separately for each defendant, rather than jointly).

First, this Court followed the practice of apportioning restitution separately, in the amount of the defendants' individual gains, in sentencing Beital and Verdi. Both defendants, though co-conspirators, were ordered to pay restitution only in the amounts

18

that they profited – not in the amounts of the losses to Schonfeld or any other entity. (Beital was ordered to pay $120,000 and Verdi $1,100,000.) Thus, it would be consistent and fair for Suarez also to be liable for what he gained – the $125,000 that he has already forfeited. *Cf., e.g., United States v. Rodriguez*, No. 00 CR 91-01 (RWS), 2002 WL 31426311, at \*\* 14, 16 (S.D.N.Y. Oct. 28, 2002) (where defendant who was a Team Leader pleaded guilty to conspiracy, restitution was limited to the loss amount attributed to him individually, excluding the amount attributable to his team).

Second, to impose joint and several liability on Suarez in the King scheme would be unfair because Suarez was not equally culpable with King and Garcia. Relative to Garcia and King, Suarez's profits were small. Unlike King and Garcia, Suarez profited from the scheme for only three months (a total of about $35,000, already forfeited). Moreover, as discussed, Suarez was recruited by King, whom he considered a friend. King initiated the scheme and solicited Suarez's participation (Suarez had no contact with Garcia). To make Suarez liable for the total losses of this scheme – which the government has calculated at over $300,000 – would be unduly harsh. Under these circumstances, it would be more fair to assign Suarez a share of restitution proportionate to his lesser gain and lesser contribution to the victims' losses. *See, e.g., DeRiggi*, 893 F. Supp. at 175 (declining to impose joint and several liability, and apportioning restitution in proportion to culpability).

Third, assigning Suarez to pay $391,187.92 in total restitution (as the government advocates) would be an undue burden. After paying forfeiture and legal expenses associated with this case and the case brought by the SEC, and after a year of unemployment, Suarez's finances are depleted. Indeed, at 60, Suarez's liabilities exceed his liquid assets (we exclude his car and house, jointly owned with his wife, and his one-

19

fourth share in his sister's house).  He currently earns $12.50 an hour.  His wife, who is

the primary breadwinner, is 67 years old.  They are just getting by as is and they are close

to retirement.  *See* Defendant's Objections, pp. 4-6.

 Fourth, the purpose of restitution is to make the victims whole, and Schonfeld and

VDM can be made whole without adding an undue burden on Suarez.  Beital and Garcia

have been ordered to make restitution of, respectively, $120,000 and $301,000.  As part

of his cooperation agreement, Suarez forfeited $125,000, which the government can

apply to restitution.  The total of these funds is $546,000, far more than is needed to

compensate VDM and Schonfeld.  (The funds available for restitution will likely be even

greater after King's sentencing on June 25.)  *See United States v. Breskin*, No. S295 CR

1091 (SAS), 2010 WL 546976 (S.D.N.Y. Feb. 17, 2010) (ordering that the amount of

restitution should be offset by (1) the defendant's already-forfeited funds and (2) the

restitution paid by the codefendant); *United States v. Brennan*, 526 F.Supp.2d 378, 386

(E.D.N.Y. 2007) (noting that as to some forfeiture amounts "provided in the various plea

agreements . . . it may be that an offset can be allowed").  *See also United States v.

Boccagna* , 450 F.3d 107, 119 (2d Cir. 2006) (a court will "assume that a restitution order

will be satisfied and, with that assumption in mind, strives to award restitution in the full

amount . . . without providing recovery in excess of that amount") (internal quotation

marks omitted), *citing Nucci*, 364 F.3d at 422-24 (even if joint liability is imposed, a

victim's recovery is "limited to the amount of its loss").

 In sum, imposing liability on Suarez for the full amount of loss is unnecessary,

given the resources and culpability of the three other defendants.

 For all of these reasons, we respectfully request that Suarez's restitution be

limited to the amount he has already forfeited.

20

## **Conclusion**

Suarez is a remorseful, decent and hard-working person, whose offenses in 2004 were inconsistent with his life before and after.  Suarez's history, personal characteristics, age, physical condition, remorse, and cooperation warrant a non-incarceratory sentence.

We respectfully request that the Court impose a non-incarceratory sentence. We further request that the Court impose no fine and that no additional restitution be ordered, beyond the $125,000 that Suarez has already forfeited.

Dated: June 22, 2010
New York, New York

Respectfully submitted,

COHEN & GRESSER LLP

By: _Mark S. Cohen (by EFB)_
Mark S. Cohen (MC 9055)
Elizabeth F. Bernhardt (EB 4637)
100 Park Avenue, 23rd Floor
New York, New York 10017
Phone:  (212) 957-7600
Fax:  (212) 957-4514

21